**OBISPO OIL CO. v. WELCH, Collector of Internal Revenue.**

No. 3334.

District Court, S. D. California, Central Division.

April 1, 1931.

Dana Latham, Joseph D. Peeler, and Melvin D. Wilson, all of Los Angeles, Cal., and Miller & Chevalier, of Washington, D. C., for plaintiff.

Samuel W. McNabb, U. S. Atty., and Alva C. Baird, both of Los Angeles, Cal., and C. M. Charest, Counsel, Bureau of Internal Revenue, of Washington, D. C., for defendant.

JAMES, District Judge.

This action is brought to recover for what is alleged to have been an overassessment of income and profits taxes paid by the plaintiff for the year 1920.

Plaintiff, prior to the year 1914, was engaged in the development and production of crude petroleum. It was a successor in title to a claim held under a placer mining location, covering forty acres of land in the Kern River district, Cal. The placer location was made in the year 1900. This land came within the effect of a withdrawal order issued by President Taft on September 27, 1909. This order purported to temporarily withdraw from all forms of "location, settlement, selection, filling, entry or disposal" areas designated. The withdrawal order contained the condition that "all locations or claims existing and valid at this date may proceed to entry in the usual manner after field investigation and examination." Notwithstanding the order of withdrawal, possession was maintained of the land in question and drilling operations were prosecuted, with the result that in December, 1913, a well was completed, which became a heavy producer of oil. Other wells were thereafter drilled and the output thereby increased.

In March, 1914, the government instituted an action against the plaintiff here and

others to oust them from possession and to recover proceeds of oil theretofore produced. The United States District Court in that action appointed a receiver to take charge of the property, with direction to impound the proceeds therefrom. From that time until the year 1920, the plaintiff proceeded to produce and market oil under the direction of the receiver, making return to the latter of the proceeds thereof. For each year during the incumbency of the receiver, the plaintiff made its income tax return to the government, and therein accounted for income and profits as though it were in undisputed ownership and possession.

The court passed its decree, which was in favor of the government, and an appeal was taken by this plaintiff to the Circuit Court of Appeals for the Ninth Circuit. In that suit, the oil company (plaintiff here) maintained that it was holding under a valid location which, having been completed prior to the withdrawal order of September 27, 1909, was unaffected thereby. The trial court determined that the location was in all respects properly made and that the oil company was claiming in good faith, but that as it had not made discovery of oil or gas at the date of the withdrawal order, it had no right to resist the effect of the latter. Congress in June, 1910, passed an act (amended August, 1912) giving express authority to the President to issue withdrawal orders, with the limitation that the rights of persons bona fide occupants or claimants of oil or gas lands, who at the date of the withdrawal order were in diligent prosecution of work leading to discovery, should not have their right impaired. 43 USCA §§ 141, 142.

In February, 1920, a further act was passed with the evident purpose of furnishing a means of adjustment where questions of dispute had arisen as to the application of the withdrawal order of September 27, 1909 (30 USCA § 227). This act provided that if within six months after the date thereof, claimants under placer mining locations to oil or gas bearing land would relinquish to the United States "all right, title, and interest claimed and possessed prior to July 3, 1910, and continuously since  *  *  *  and upon payment of a royalty to the United States of ⅛ of oil and gas already produced, the claimants should be entitled to a twenty year lease of the land, to pay, nevertheless, a royalty of not less than 12½ per cent. of all oil and gas produced.  *  *  *" Also that "upon the delivery and acceptance of

the lease, as in this section provided, all suits brought by the Government affecting such land may be settled and adjusted in accordance herewith *and all moneys impounded in such suits  *  *  *  shall be paid over to the parties entitled* thereto."

The case of the United States against this plaintiff, hereinbefore mentioned, was pending on appeal in the year 1920, and the claimant made request to relinquish its rights and take a lease as provided by the act above referred to. The Land Office was favorable to this action, and the Commissioner of the General Land Office reported his view to the Secretary of the Interior, in the course of which communication, he said: "I have, therefore, the honor to recommend that the Attorney General be requested, in the absence of any objection which may be a bar to such action, to cooperate with this department with a view to securing a dismissal of the suit, the payment to the United States of the ⅛ value of past production, and the release of the remaining funds to the applicant company. I have also to recommend that the applicant be granted a lease, substantially in the form set out in the leasing regulations, for a term of twenty years, with a provision for the payment of the royalty prescribed in the leasing regulations.  *  *  *" A stipulated mandate was thereupon returned from the Circuit Court of Appeals and the adjustment was completed. The receiver at that time had in his custody the proceeds from sales of oil, which had accumulated during the period of his receivership, and after there was deducted, pursuant to the terms of the adjustment, one-eighth thereof, the remainder was delivered to the plaintiff. A considerable part of these oil returns was represented by Liberty bonds, in which the receiver had made investment. These bonds at cost value amounted to $891,607.62. In 1920, when the plaintiff received them from the receiver, their market value was $843,785, or $47,822.62 less than cost.

The Commissioner of Internal Revenue, in fixing the amount of plaintiff's income and profits tax for the year 1920, charged as income for that year the total value of the property relinquished by the receiver to the plaintiff, included in which were the Liberty bonds at their cost price. The tax amounts paid by plaintiff as for returns on oil sales for the several years during which the receiver was in charge, were treated as over-assessments by the commissioner and credit was given the plaintiff on the amount assessed in the year 1920, with the result that

the difference between the total tax paid during the receivership years and the grand total assessed on the account stated in 1920 was $266,162.43. This amount plaintiff seeks to recover after having protested payment.

It is contended, first, that the commissioner was not justified in including in his 1920 assessment the total amount of oil proceeds theretofore impounded in the hands of the receiver. As before noted, the plaintiff had regularly made its returns for each year that the receiver was in charge, and had paid taxes as imposed by the Revenue Acts in full at the respective times. If the plaintiff is right in its contention that the funds in the hands of the receiver, being definite and segregable as to the different years when they accrued as a result of marketing operations, were properly chargeable only to it as returns for the separate years, then it follows that the amount sued for was illegally exacted.

There are two other matters of question argued as affecting the correctness of the commissioner's assessment—one is as to the valuation of the Liberty bonds at cost rather than their value as of the year when they were delivered to the plaintiff, and the second refers to the method adopted by the Revenue Department in computing deductions for depletion of property by reason of the removal of the oil. The depletion deductions referred to the several years during the period of receivership, and the basis of calculation was referable to the state of the law in the separate years. The plaintiff's position is that if the oil proceeds received from the receiver were chargeable as income in total for the year 1920, depletion deductions should be made under the law as it existed in the year 1920, which would make an apparent difference in plaintiff's favor of deductible depletion in the amount of almost $500,000. It will be seen that if plaintiff's contention that the income from oil sales were chargeable only against it for the particular years when such income was produced is sustained, then the separate points as to the valuation of the Liberty bonds and the depletion deductions are eliminated from the case.

It seems quite clear that the Leasing Act of 1920 (30 USCA § 181 et seq.), was originated with the purpose of settling troublesome controversies which had arisen as a result of the withdrawal order of September 27, 1909. Suits no doubt were pending, similar to the one brought by the United States against the plaintiff here, to eject persons holding under, properly recorded placer claims from land included within the withdrawal order.

Counsel for the government argue that property or money, the collection of which is contingent or questionable, cannot be included within a tax return for any year when such uncertain condition exists. There can be no question about the general application of such a rule. But, in this case, neither can there be a question but that the government, by its lease settlement, recognized that the plaintiff had some right which might be by the courts adjudicated in its favor. The leasing act provided a means of settlement of controversies. By such settlement, the government conceded the right in the plaintiff to have the proceeds of the oil as separately received during the different years of the receivership. That money had been identified and determined in amount at and for each of those years. There was nothing contingent about the amount or the fact of possession thereof in the hands of the receiver. When the government settled its case with the plaintiff, it ratified the claim of the plaintiff to each of the separate amounts of production return, with the contract condition that one-eighth thereof should be paid over.

Let us suppose that in the suit brought by the government against the plaintiff, no receiver had been appointed, but that pending determination of the action the plaintiff had pursued its regular business of developing and marketing its oil from the property in dispute. Also that it had made due return each year for income and profits on its oil sales. Could it have been contended, when in 1920 the same lease settlement that was concluded had been made, that the government could charge, as income for the year 1920, the full amount of the proceeds from oil sales? The only difference in this situation, and the one that did exist, was that the arm of the court had interposed to hold the stakes at suit undisturbed and beyond the reach of either party to dispose of the same. When the settlement was made it related back and assured the title of plaintiff to seven-eighths of the oil sales proceeds as collected during the separate years. Plaintiff had during each of those years fully accounted to the government for those same proceeds in its income tax payments. It ought not to be compelled to do more.

Findings and judgment will be entered in favor of plaintiff.